UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ADRIENNE D. WILSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:17-CV-2044 PLC |
| | ) |
| ANDREW SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

Plaintiff Adrienne Wilson seeks review of the decision by Defendant Commissioner of Social Security Andrew Saul denying her application for Supplemental Security Income (SSI) under the Social Security Act. For the reasons set forth below, the Court reverses and remands the Commissioner's decision.

### I.  Background and Procedural History

In March 2014, Plaintiff, who was born in February 1966, filed an application for SSI alleging that she was disabled as of March 20, 2005[1] as a result of: "rheumatoid arthritis, osteoarthritis, sciatica arthritis, nerve damage, diabetes, obesity, fibromyalgia, both knees damaged, left knee needs to be replaced, [and] tarsal tunnel syndrome." (Tr. 30-31, 128-31) The Social Security Administration (SSA) denied Plaintiff's claims, and she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 29, 126-27)

In July 2016, the ALJ conducted a hearing at which Plaintiff and a vocational expert testified. (Tr. 1519-72) In a decision dated January 4, 2017, the ALJ found that Plaintiff "has not

---

[1] Plaintiff amended her alleged onset date to March 21, 2014. (Tr. 1523)

been under a disability, as defined in the Social Security Act, from March 21, 2014, through the date of this decision[.]" (Tr. 15-28)  Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review.  (Tr. 5-7)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision.  Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II. Evidence Before the ALJ[2]

Plaintiff testified that she was fifty years old, lived with her boyfriend, and had a high school education and a CNA license.  (Tr. 1527,1551-52, 1567)  Plaintiff's last full-time job was working as a cashier in 2005.  (Tr. 1530)

When the ALJ asked Plaintiff to identify the primary reason she was unable to work, Plaintiff answered, "[t]he rheumatoid arthritis and the fibromyalgia and the Raynaud's syndrome." (Tr. 1540-41)  Plaintiff also stated that the "biggest problem[s]" she had walking were "[m]y back and my knee and my right ankle."  (Tr. 1544)  Plaintiff testified that she had "seven screws and a metal plate in this ankle and I have tarsal tunnel syndrome in this ankle."  (Tr. 1550)

Plaintiff testified that she underwent surgery on her left knee in 2005 and her right knee in 2006. (Tr. 1545, 1548)  More recently, Plaintiff received injections in her left knee.  (Tr. 1547) Her doctor planned to administer one more injection and "then they're talking about a knee replacement."  (Tr. 1547)  Plaintiff was also receiving injections in her back every three to four weeks, which significantly reduced her back pain and improved her mobility.  (Tr. 1548)  Plaintiff stated, however, that her doctor would give her the last injection in August, and then "I might have to have back surgery to remove the L-something bone…."  (Tr. 1549)

---

[2] Because Plaintiff challenges the ALJ's determination of her physical residual functional capacity, the Court recounts the evidence relating to Plaintiff's physical impairments.

2

Plaintiff explained that she also had difficulty using her right arm and both hands. For example, despite undergoing rotator cuff surgery in 2004, it was painful to raise her right arm. (Tr. 1557) She testified that "it's hard to like hold my arm up long or comb my hair" and she was unable to use a keyboard "because the stiffness that gets in my elbow and my shoulder, it really stiffens up so it kind of like locks…." (Tr. 1557-58) In addition, she was recently diagnosed with Raynaud's syndrome, which caused her fingers to change colors and tingle when she was cold. (Tr. 1570) Plaintiff stated that the medication prescribed by her rheumatologist was not helping and she did not "have any functioning in my fingers and they feel kind of funny…." (Id.)

Plaintiff testified that she had suffered headaches for many years, and a neurologist recently diagnosed a type of "tumor" behind her eye. (Tr. 1561) Despite taking medication, she continued to feel "quick sharp pains around in here or when like I get under stress or when I'm in pain then it just shoots … like shooting pains…." (Tr. 1561-62) Finally, Plaintiff stated that she received allergy shots every week and had interstitial lung disease, which caused her to experience "shortness of breath sometimes." (Tr. 1553-54)

The ALJ questioned Plaintiff about a brief period of employment in April 2016. (Tr. 1530-34) Plaintiff explained that her mobility improved when she began receiving injections in her back and she obtained employment at a grocery store deli counter. (Tr. 1531) However, on her second or third day of work, "my back locked up on me. It just shut down and I couldn't move. I couldn't walk." (Tr. 1532, 1534) Plaintiff's manager called Plaintiff's boyfriend, who picked her up and drove her to the emergency room. (Tr. 1534)

Plaintiff testified that she did not sleep well due to pain and, on a typical day, she slept eight to nine hours because her medications made her tired. (Tr. 1529, 1560) Plaintiff's mother came to her house "at least two times a week" to cook, clean, and do laundry. (Tr. 1555) Plaintiff's

3

boyfriend also "does a lot of the cooking … and put[s] things in containers for me, where all I have to do is put it in the microwave and eat it." (Tr. 1556)  Plaintiff "sometimes" drove but not if she was taking her medication. (Tr. 1559)

A vocational expert also testified at the hearing. (Tr. 1562-71)  The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work experience and the ability to perform light work with the following limitations:

> This person can never climb ladders, ropes or scaffolds and the remaining posturals would be occasional.  Also assume balance is at occasional.  Also assume this individual should … have only occasional exposure to operation[al] control of moving machinery, unprotected heights or the use of hazardous machinery.  Further assume that this individual would be limited to work that is simple, routine and repetitive tasks in a work environment free of fast-paced quota requirements involving only simple/work-related decisions with few, if any, workplace changes and no interaction with the public ad only occasional interaction with coworkers.

(Tr. 1567)  The vocational expert testified that such an individual could not perform Plaintiff's past relevant work, but there were jobs at both the light and sedentary levels that the person could perform. (Tr. 1567)  Specifically, the hypothetical individual could perform the light jobs of marker and "slot tag inserter" and the sedentary jobs of "weave defect charting clerk" and weight tester. (Tr. 1568)  However, if the hypothetical individual would miss three days of work per month, she would not be able to maintain employment. (Tr. 1568-69)

In regard to Plaintiff's medical records, the Court adopts the facts that Plaintiff set forth in her statement of uncontroverted facts and the Commissioner admitted. [ECF Nos. 22, 29-1]  The Court also adopts the facts set forth in the Commissioner's statement of additional facts. [ECF No. 29-2]

**III.     Standards for Determining Disability Under the Act**

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled.  42 U.S.C. § 423 (a)(1); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months."  42 U.S.C. § 423(d)(1)(A); See also 20 C.F.R. § 416.905(a).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...."  42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. § 416.920; see also McCoy v. Astrue, 648 F.3d 605, 511 (8th Cir. 2011).  Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work.  Id.

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations."  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. 404.1545(a)(1)); see also 20 C.F.R. §§ 416.920(e), 416.945(a)(1).  Through step four, the burden remains with the claimant to prove that he or she is disabled.  Moore, 572 F.3d at 523.  At step five, the burden shifts to the Commissioner

to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform.  Id.; Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.    ALJ's Decision

The ALJ applied the five-step evaluation set forth in 20 C.F.R. § 416.920 and found that Plaintiff:  (1) had not engaged in substantial gainful activity since March 21, 2014, the amended alleged onset date; and (2) had the severe impairments of osteoarthritis, residuals of remote right ankle fracture, interstitial lung disease, lumbar degenerative disc disease, Sjogren's syndrome, fibromyalgia, obesity, and depression, and the non-severe impairments of diabetes, sleep apnea, and tarsal tunnel syndrome.  (Tr. 17-18)  At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18)

The ALJ found that, although Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical and other evidence in the record for the reasons explained in this decision." (Tr. 21)  The ALJ determined that Plaintiff's impairments were less debilitating than she alleged because:  (1) she was able to independently perform many activities of daily living; (2) the objective medical evidence and physical examinations findings did not support the  alleged intensity of symptoms and resultant limitations; (3) her treatment was conservative, consisting primarily of prescribed medications; and (4) Plaintiff worked after the alleged onset date.  (Tr. 22, 25-26)

After reviewing Plaintiff's testimony and medical records, the ALJ found that Plaintiff had the RFC to perform light work with the following limitations:

> [N]o climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, or crawling; occasional exposure to hazards (unprotected heights, hazardous machinery, operational control of moving machinery); and capable of work that is simple, routine, repetitive tasks in a work-environment free of fast paced quota requirements involving only simple work-related decisions with few, if any, work-place changes with no interaction with the public and only occasional interaction with coworkers.

(Tr. 20) Based on the vocational expert's testimony, the ALJ found that Plaintiff could not perform her past relevant work but she could perform light jobs that existed in significant numbers in the national economy, such as marker and "slot tag inserter."  (Tr. 27-28)   The ALJ therefore concluded that Plaintiff was not disabled. (Tr. 28)

## V.    Discussion

Plaintiff claims that the substantial evidence did not support the ALJ's finding that she was not disabled because:  (1) the record contained no evidence of Plaintiff's ability to function in the workplace that supported the RFC determination; and (2) the ALJ failed to properly consider the Medical-Vocational Guidelines, which, based on Plaintiff's age and past unskilled work, would have directed a decision of "disabled" if the ALJ found that Plaintiff was limited to sedentary work.[3]  [ECF No. 21 at 3, 14]  The Commissioner counters that the ALJ "properly considered the medical opinion and other evidence in evaluating Plaintiff's subjective symptoms and in determining her RFC."  [ECF No. 29 at 4]

### A.  Standard of Judicial Review

---

[3] The Medical-Vocational Guidelines, or "Grid Rules," are "a set of charts listing certain vocational profiles that warrant a finding of disability or non-disability." Phillips v. Astrue, 671 F.3d 699, 702 (8th Cir. 2012).  Grid Rule 201.12 provides that persons limited to sedentary work, who are closely approaching advanced age, ages 50–54, and who are high school graduates and have unskilled work experience, are presumptively disabled.  20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.12.

7

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B.  RFC

Plaintiff contends that substantial evidence did not support the ALJ's RFC determination because there was no evidence in the record addressing Plaintiff's ability to function in the workplace.  More specifically, Plaintiff argues that, because the ALJ assigned no weight to the consulting examiner's opinion and her treatment records contained significant clinical findings, substantial evidence did not support the ALJ's finding that Plaintiff was able to perform a limited

8

range of light work.[4]  In response, the Commissioner asserts that the ALJ's findings were supported by substantial evidence.

RFC is the most a claimant can still do in a work setting despite that claimant's physical or mental limitations.  Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (citation omitted); 20 C.F.R. § 416.945(a)(1).  An ALJ determines a claimant's RFC "based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of [his] limitations."  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

Although the ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence, "a claimant's residual functional capacity is a medical question."  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)).  See also Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)).  "An administrative law judge may not draw upon his own inferences from medical reports."  Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

---

[4] The regulations provide:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 416.967(b).

9

Here, the record contained one medical opinion relating to Plaintiff's physical ability to function in the workplace, and the ALJ discredited that opinion in its entirety.[5] As Plaintiff acknowledges in her brief, the absence of medical opinion evidence does not necessarily require remand. The Eighth Circuit has held that, in the absence of medical opinion evidence directly addressing a claimant's ability to function in the workplace, mild or unremarkable objective medical findings and other evidence might constitute sufficient medical support for an RFC finding. See, e.g., Hensley, 829 F.3d at 929-34; Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008).

Plaintiff's voluminous medical records contained a combination of normal and abnormal objective findings, with several consistent and significant abnormal findings that appear to be inconsistent with an ability to perform light work. For example, in October 2014, Plaintiff's primary care physician Dr. Wright noted Plaintiff's complaints of arthralgias, pain at multiple joints and muscle groups, "legs are giving out more frequently," "increased pain at her pelvic girdle with tingling down the lateral aspect of both thighs." (Tr. 783) On examination, Dr. Wright observed: "[m]arked pain with LLE and RLE raise beyond 30 degrees from resting. Marked tenderness at the calves, knees, ankles." (Tr. 784) He ordered an MRI of Plaintiff's lumbar spine, which revealed: "Degenerative L4-5 anterolisthesis and mild L5-S1 degenerative disc and joint disease[.]" (Tr. 823)

Plaintiff's rheumatologist Dr. Syed regularly noted joint tenderness and swelling, crepitus of the knees, positive rheumatoid factor, and positive trigger points. In February 2014, Dr. Syed

---

[5] Dr. Velez performed a consultative examination in August 2014 and concluded that Plaintiff "would not have limitations with regard to sitting, standing, walking," or manipulation and could maintain employment in a "situation in which she is allowed to have normal breaks to rest and will be given the opportunity to follow closely for doctors' appointments." (Tr. 485) The ALJ gave no weight to Dr. Velez's opinion that Plaintiff had no physical limitations because it was "not consistent [with] the objective medical evidence of record." (Tr. 26)

recorded tenderness in the knees; left calf tender to palpation; "bilateral knees crepitus/clicking to flexion left more than right"; rheumatoid factor positive; and elevated liver enzymes. (Tr. 294-96) In September 2014, Dr. Syed observed that Plaintiff exhibited "diffuse joint and muscle tenderness" and her fibromyalgia was "very active." (Tr. 828) On examination, Dr. Syed noted: "T1S0 all joints; poor grip because of pain and stiffness; MS 5/5 otherwise; 14/18 trigger points." (Tr. 831-32) Knee x-rays the same month showed: "mild medial compartment osteoarthritis of the right knee" and "mild medial and patellofemoral compartment osteoarthritis of the left knee." (Tr. 1444)

In January 2015, Plaintiff presented to Dr. Syed with "possibly worsening lung disease and digital ulceration with Raynaud's." (Tr. 1164) A musculoskeletal exam revealed: "B/L knee crepitance with PROM; T1S0 all joints; MS 5/5 = otherwise; 12/18 trigger points." (Tr. 1168) On examination in November 2015, Dr. Syed noted: "PIP – S1, T1, no restrictions in range of motion; wrists – S1, T1, no restrictions in range of motion; B/L knee crepitance; T1S0 all joints; MS 5/5; 18/18 trigger points." (Tr. 1291) In April 2016, Dr. Syed noted that Plaintiff used a cane to ambulate, she was tearful during interview, and a physical examination revealed "ext tender all muscles and joints with minor touch," "back L4-L5 tenderness," and "18/18 trigger points (also pain/tenderness in non trigger points)." (Tr. 1330, 1338) An x-ray of Plaintiff's left knee performed in April 2016 showed moderate osteoarthritis. (Tr. 1452-53)

Plaintiff's orthopedic surgeon Dr. Whiting treated Plaintiff for osteoarthritis of the knees and recorded significant clinical findings. When Dr. Whiting first examined Plaintiff in January 2015, he noted: "tenderness of the medial joint line and lateral joint line. Range of motion R knee – 0 extension, 110 flexion, L knee – 0 extension, 90 flexion. There is grade 2 valgus laxity. There is grade 1 posterior sag …. Quadriceps strength is 4/5" and her gait was "limping." (Tr.

11

1193)  X-rays revealed bilateral knee osteoarthritis and "moderate osteoarthritis of the left knee with joint space narrowing, sclerosis, and osteophyte formation most pronounced in the medial compartment."  (Tr. 1222)

Dr. Whiting administered a left knee corticosteroid injection in March 2015.  (Tr. 810)  In August 2015, he noted that the "corticosteroid injections … failed" and Plaintiff's symptoms of pain, including "difficulty ambulating, difficulty standing, difficulty with stair climbing, and difficulty with personal hygiene are interfering with patient's lifestyle."  (Tr. 863)  That month, Dr. Whiting administered another corticosteroid injection to Plaintiff's left knee.  (Tr. 803)  In January 2016, Dr. Whiting performed a repeat left knee injection and suggested arthroplasty.  (Tr. 1318-19)

Pain specialist Dr. Beuer began treating Plaintiff in June 2015 and diagnosed lumbosacral radiculopathy and possible lumbosacral facet arthropathy.  (Tr. 534-35, 539)  At Plaintiff's first appointment, Dr. Beuer observed that she walked with a cane for stability and wrote that her MRI showed "some moderate spondylosis."  (Tr. 535, 539)  Dr. Beuer administered a lumbar epidural steroid injection August, November, and December 2015.  (Tr. 594, 634, 660)

In January 2016, Plaintiff informed Dr. Beuer that she experienced "excellent relief" from the epidural steroid injection, but "feels like the relief that she had gotten is starting to wear off some.  That is, she again has some component of low back pain radiating in the left lower extremity."  (Tr. 687)  Dr. Beuer assessed lumbago, lumbar spinal stenosis, lumbar radiculopathy, and bilateral knee pain.  (Tr. 688)  He informed Plaintiff that he was concerned about her "overall steroid exposure," and suggested that "[s]urgical intervention or potential spinal cord stimulator may eventually be the best solution."  (Id.)  Dr. Beuer administered a left L4-5 transforaminal

epidural steroid injection to treat lumbago, lumbar spinal stenosis, and lumbar radiculopathy in February 2016.[6]  (Tr. 706)

Finally, the medical records created by Plaintiff's pulmonary specialists contained significant objective clinical findings.  For example, an April 2014 CT scan of Plaintiff's chest revealed:  "mild upper lobe and centrally predominant groundglass opacities with associated smooth interlobular septal line thickening (crazy paving pattern) similar in appearance to prior exam" and an "indeterminate 10 x 7 mm left lower lobe nodule, unchanged."  (Tr. 429)  In July 2014, Plaintiff's pulmonary specialist diagnosed Plaintiff with "probabl[e] interstitial lung disease – related to CTD including RA and Sjogren syndrome."  (Tr. 977)

A CT scan of Plaintiff's chest in December 2014 showed:  "Patchy ground glass opacities in a lobular distribution, slightly increased in both lungs and predominantly involving the upper lobes"; "[i]ndeterminate 10 x 7 mm left lower lobe nodule, unchanged"; "[e]nlarged pulmonary artery compatible with pulmonary hypertension."  (Tr. 1206)  A pulmonary function test revealed: "mild restrictive ventilatory limitation; significantly decreased reserve volume likely secondary to the patient's obesity; mild reduction in diffusion capacity adjusted for hemoglobin and carboxyhemoglobin; [and] elevated carboxyhemoglobin is suggestive of active smoking."  (Tr. 1467)  Plaintiff's pulmonary specialist diagnosed:  dyspnea with exertion due to either probable congestive heart failure – diastolic or worsening rheumatoid arthritis-interstitial lung disease; obstructive sleep apnea; Sjogren syndrome and elevated rheumatoid factor on azathioprine; and chronic allergic rhinitis.  (Tr. 1115)

---

[6] In April 2016, Plaintiff presented to the emergency room with "worsening right hip pain and right lower back pain.  Her lower back pain goes into the right gluteal region and shoots down the leg at times."  (Tr. 524)  Physical examination revealed tenderness in the arms and lumbar and right gluteal areas.  (Tr. 536)

A pulmonary function test in March 2015 revealed "chronic interstitial pneumonitis, with significant decline in FVC and DLCO," associated with Sjogren syndrome and/or rheumatoid arthritis or possibly due to smoking.  (Tr. 815)  In December 2015, a pulmonary function test showed:  mild restrictive ventilatory limitation; significantly decreased expiratory reserve volume; mild reduction in diffusion capacity adjusted for hemoglobin and carboxyhemoglobin; elevated carboxyhemoglobin suggestive of smoking; and a significant decrease in FVC compared to April 2014 study.  (Tr. 816)

In his decision, the ALJ reviewed the diagnostic findings and determined that "these findings fail to support the intensity of symptoms and resultant limitations alleged by the claimant."  (Tr. 25)  Additionally, the ALJ stated that, while "there have been acute abnormalities noted" on physical examination, "the pattern of objective physical examination findings in the medical evidence does not support the intensity of symptoms or resultant limitations alleged by the claimant."  (Id.)  Based on these findings, the ALJ determined that Plaintiff had the RFC to perform a limited range of light work.  (Tr. 20)

Other than the August 2014 opinion of a one-time, consultative examiner, which the ALJ assigned no weight, the record contained no opinions from treating or examining physicians.  This is particularly problematic given that Plaintiff had numerous severe, physical impairments affecting different areas of her body, namely:  osteoarthritis, residuals of remote ankle fracture, interstitial lung disease, lumbar degenerative disc disease, Sjogren's syndrome, fibromyalgia, and obesity.  In the absence of a medical opinion evidence, the ALJ drew upon his own inferences from the medical evidence in finding that Plaintiff could perform light work.  See, e.g., Wilkins v. Colvin, 2016 WL 5334976, at *5-6 (E.D. Mo. 2016).  "Unless the inferences are supported by opinions from treating or consultative experts, they do not constitute substantial evidence."  Id.

(quoting Hess v. Colvin, 4:14-CV-1593 CDP, 2015 WL 5568056, at *11 (E.D. Mo. Sept. 22, 2015) (citation omitted); see also Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009) (the law forbids the ALJ from "playing doctor").  In evaluating Plaintiff's RFC, the ALJ "was required to consider at least some supporting evidence form a medical professional." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

   The Commissioner asserts that certain mild or unremarkable objective findings in the record supported the ALJ's determination that Plaintiff was able to perform a limited range of light work.  The Commissioner points out, and the ALJ noted, that Plaintiff walked at a normal pace during a six-minute walking test and physical examinations often revealed Plaintiff's lungs were clear to auscultation and she had no significant joint or spine abnormality, range of motion limitation, muscle atrophy, or neurological defects.  However, neither the ALJ nor the Commissioner explained how these findings related to Plaintiff's ability to sit, stand, walk, lift, carry or perform other work-related activity on a sustained basis.  See, e.g., Biegel, 2018 WL 4636091, at *9.  As previously stated, "light work" requires either "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b).  Given the numerous other remarkable findings in the record, it is not apparent to the Court, how the findings identified by the Commissioner support an ability to perform a limited range of light work on a sustained and full-time basis.[7]  See, e.g., Biegel, 2018 WL 4636091, at *9; Massa v. Saul, No. 4:18-CV-877 SPM, 2019 WL 4305010, at *6 (E.D. Mo. Sept. 11, 2019).

---

[7] Because the Court finds that substantial evidence did not support the RFC determination, the Court does not address Plaintiff's claim that the ALJ failed to properly consider the Grid Rules.

15

## VI. Conclusion

Because the ALJ's RFC assessment was not supported by "some medical evidence" in the record that addressed Plaintiff's physical ability to function in the workplace, the Court reverses and remands this case for further consideration. Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of May, 2020